```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
                       NORTHERN DIVISION
                         AT COVINGTON
```

**CIVIL ACTION NO. 2011-94 (WOB-JGW)**

**SHAWN HARRIS**                                                **PLAINTIFF**

**VS.**            **MEMORANDUM OPINION AND ORDER**

**PETSMART, INC.**                                              **DEFENDANT**

Plaintiff brings this action alleging claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964.  (Doc. 1, Doc. 22 at 4 n.1).

This matter is before the Court on defendant's motion for summary judgment (Doc. 17).

The Court heard oral argument on this motion on Wednesday, October 3, 2012.  James Moore represented the plaintiff, and LaToi Mayo represented the defendant.  Official court reporter Joan Averdick recorded the proceedings.

Having heard the parties, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

Plaintiff Shawn Harris ("Harris") was hired by PetSmart as a part-time dog trainer on October 28, 2008.  In conjunction with his hire, Harris completed an employment application and was interviewed by PetSmart employee Michael Dixon ("Dixon").

In a section entitled "Criminal History," the application Harris completed contained the following two questions:

> Have you been convicted of a felony in the past 10 years?
>
> Have you been convicted of any other crimes in the past 10 years?

(Doc. 17-4 at 10).

Harris asked Dixon if he should include recent hunting violations in response to the second question. Dixon asked the store manager how to handle the situation, and he told Harris that the questions did not pertain to hunting violations. (Harris Depo. 76-78). Harris thus answered "no" to both of the questions and signed the application on a line preceded by the following statements:

> I hereby certify and affirm that the information provided in connection with the application process is true, accurate and complete, and that I have withheld nothing that would, if disclosed, affect this application unfavorably.
>
> . . .
>
> I understand that any omissions, misrepresentations, or falsification in connection with this application process may be grounds for denial of employment or, if hired, immediate termination of employment.

(Doc. 17-4 at 11).

Within a month of his employment, Mr. Harris was promoted to a full-time dog trainer.

When Harris began at PetSmart, Dixon told Harris that he (Dixon) was homosexual and that he had hired Harris because he

2

thought he was cute. (Harris Depo. 119, 157). When Harris worked with Dixon, usually once a week, Dixon would buy Harris lunch and tell him to keep the change. Dixon also offered Harris $2,000 if he would have sex with Dixon's boyfriend and allow Dixon to tape it. (Harris Depo. 176-77). Harris thought Dixon was joking and so did not report the matter. Dixon also once whispered in Harris's ear during a dog training class that he had had sex with an adult male customer, who was present, when the man was underage. (Harris Depo. 177-80).

Dixon also gave Harris gifts, including a used laptop, clothing, and a gym membership.

On one occasion at the gym, Harris caught Dixon looking at him in the shower. Dixon later commented on Harris's physical attributes to co-workers at PetSmart and stated that he could make Harris "go gay," which Harris overheard. (Harris Depo. 158-59, 170).

Sometime in May 2009,[1] Harris reported the gym incident to an employee he identified as "Jamie," an assistant manager.[2] Jamie told Harris to "watch his back" because Dixon would find a reason to get him fired. (Harris Depo. 170-72). Unhappy with

---

[1] As will be discussed below, Harris's deposition testimony is vague as to the timing of various events, including these complaints.

[2] Harris gave no last name for "Jamie," and PetSmart has stated that its database listed no managerial employee at the Florence, Kentucky store by that name. (Doc. 17-1 at 20).

3

this response, Harris told another assistant manager, Jennifer, who told him that he needed to inform Store Manager, Thomas Bogenschutz ("Bogenschutz"). (*Id.*). Harris also told another hourly manager, Kris, who likewise told him that he needed "to go higher." (Harris Depo. 310-11). Harris testified that he believed the proper course for complaining was to go up "the chain of command." (Harris Depo. 165-66).

Shortly thereafter, Harris told Bogenschutz that Dixon was making "sexual harassment comments" to him. (Harris Depo. 173-75). Harris testified that Bogenschutz just "kind of shrugged and changed the subject." (*Id.*). However, Harris also testified that, in a performance review meeting, Bogenschutz assured him that he would not be fired for filing a complaint against Dixon. (Harris Depo. at 143, 149).

Based on Bogenschutz's assurance, on May 27, 2009, Harris called PetSmart's "CareSmart" hotline, a twenty-four hour anonymous harassment hotline, and reported Dixon's actions. (Harris Depo. 189-90, 201, 226; Doc. 17-9). The hotline advisor documented Harris's call and directed him to prepare a formal written complaint, which he did. (Harris Depo. Exh. 18). PetSmart then conducted an investigation, which included interviews of other employees of the Florence store. As a result, PetSmart terminated Dixon's employment on June 17, 2009.

4

Harris testified that he requested a lateral transfer to another PetSmart location after making the complaint, but before Mr. Dixon was fired, but that Bogenschutz denied that request without giving a reason.

Harris also testified that, after Dixon was fired, Bogenschutz complained to Harris that he was not selling enough classes, and told Harris that he might hire another trainer, which would have reduced Harris's commissions. (Harris Depo. 229-30). Bogenschutz did not, however, hire another trainer. (Harris Depo. 237-39).

Harris also alleges that he was required to stay after hours and put away stock while he would normally be selling, a task he had not previously been required to perform. However, Harris testified that his personal sales numbers did not decrease. (Harris Depo. 239). Also, when Harris asked Bogenschutz for a referral for an area trainer position at another PetSmart location, he declined and told Harris that he was not qualified for the position.

On October 19, 2009, PetSmart District Manager Dan Ott received a call from a PetSmart customer. (Ott Affidavit ¶ 1). The customer, who said that she was associated with "The Touch of Healing" organization, was upset and complained that Harris had represented to her group that he was a certified therapy-dog instructor. (*Id.* ¶¶ 2-3). After paying Harris $400, however,

5

the customer said that she learned that Harris was not certified. (*Id.*). Ott told the caller that PetSmart could take no action because the matter was not related to Harris's PetSmart employment. (*Id.* ¶ 4). The caller then stated that "she could not believe that PetSmart hired convicted felons." (*Id.* ¶ 5).

This statement caused Ott to perform a public records search on Harris, which revealed that Harris had been convicted in 2007 of multiple wildlife violations, including killing deer at night using spotlights and rifles, taking waterfowl with a rifle, taking waterfowl out of season, taking deer in Indiana and transporting them to Ohio, and taking turkey in Indiana without a license and transporting them to Ohio. (*Id.* ¶ 6).

PetSmart then reviewed Harris's employment application and, finding that he had not disclosed these convictions, terminated his employment on November 5, 2009. (*Id.* ¶ 7).

Harris filed this action on April 30, 2011. (Doc. 1).

### *Analysis*

#### A. **Sexual Harassment Claim**

Title VII prohibits discrimination because of sex in the terms or conditions of employment. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of discriminatory treatment and is actionable whether it involves members of the same gender or

6

different genders. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 79 (1998).

Harris brings his Title VII claim under a hostile work environment theory, (Doc. 22 at 4 n.1), which makes actionable a workplace that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Newton v. Ohio Dep't of Rehab. and Corr.*, No. 11-3681, 2012 WL 3631493, at *4 (6th Cir. Aug. 23, 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

A plaintiff alleging a claim for a sexually hostile work environment must show that: (1) he was a member of the protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the existence of employer liability. *Rayford v. Illinois Cent. R.R.*, No. 11-5507, 2012 WL 2755844, at *3 (6th Cir. July 9, 2012) (citation omitted).

Harris has established the first three of these elements, and, for purposes of the present motion, the Court assumes he has at least raised a triable issue on the fourth. It is on the fifth element, however, that his claim fails.

The standard for establishing employer liability differs depending on whether the alleged harasser was a supervisor of the plaintiff or merely a co-worker. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). "Employer liability for co-worker harassment is based directly on the employer's conduct." *Id.* (citation omitted). Thus, an employer is liable for co-worker harassment only if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.*

"In contrast, employer liability for supervisor harassment is vicarious," but is subject to an affirmative defense. *Id.* The Supreme Court has established the test for employer liability for supervisory harassment:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability for damages . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Here, the parties dispute whether Dixon was Harris's "supervisor" for purposes of his harassment claim. The Court need not decide this issue, however, because the undisputed facts of this case negate employer liability for the alleged harassment under either theory.

PetSmart produced evidence that it had in place during Harris's employment a strict antiharassment policy, published in its employee handbook, which plaintiff admits having received. (Doc. 17-5 at 50, "Dignity in the Workplace"; Doc. 17-4; Harris Depo. 113-14). The policy provides multiple, alternative avenues through which an employee who feels they are being harassed can bring their concerns to PetSmart's attention, including reports to supervisors, district and regional managers, a Vice-President, and the toll-free "CareSmart" line. (Doc. 17-5 at 50-51).

PetSmart also published a detailed policy entitled "Associate Conduct" which prohibits conduct that might constitute harassment. (Doc. 17-8 at 1).

Although Harris's deposition testimony is vague as to dates, a fair reading is that he first complained to others in the store about Dixon in early May 2009, several months after the harassment began. (Harris Depo. 310). The first person to whom he complained, Jamie, allegedly told Harris to "watch" his back because Dixon could get him fired. Although the record is unclear as to actual identity of "Jamie" or his position, his response to Harris's concern was obviously unsatisfactory and inadequate.

Nonetheless, Harris then raised his complaints with two other employees, whose positions are also unclear, and both told

him that he needed to "go higher" and tell the Store Manager. It is undisputed that Harris did so, and while he testified that Bogenschutz's initial response was one of indifference, he also testified that Bogenschutz assured him that he could not be retaliated against for filing a complaint against Dixon. Harris testified that, based on that assurance, he called the CareSmart line on May 24, 2009. A swift investigation ensued, and PetSmart terminated Dixon's employment on June 17, 2009.

Given these facts, no reasonable jury could find that PetSmart "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). Although Bogenschutz, according to Harris's testimony, did not himself initiate the investigation into Harris's complaint, his assurance of non-retaliation caused Harris to call the CareSmart line and make a formal report of harassment, leading to prompt and decisive corrective action. *See, e.g., Kean v. IT-Works, Inc.*, 466 F. App'x 468, 470-71 (6th Cir. 2012) (affirming summary judgment for employer where it responded quickly to put a stop to alleged co-worker harassment). *See also Newton v. Ohio Dep't of Rehab. and Corr.*, No. 11-3681, 2012 WL 3631493, at *7 (6th Cir. Aug. 23, 2012) (noting that when "an employer responds with good-faith remedial action, we cannot say that the employer has itself committed an

act of discrimination") (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)).

These same undisputed facts enable Pet Smart to establish the affirmative defense to supervisory harassment.[3] PetSmart took reasonable steps to prevent harassment by promulgating policies which clearly prohibit such conduct and provide employees multiple avenues for bringing harassment to the company's attention for remediation. While Harris testified that he knew about the policies, including the availability of the 24-hour CareSmart line, there is no dispute, as discussed above, that he delayed for several months before utilizing the complaint mechanisms available to him, as his counsel conceded at oral argument. Once Harris utilized those mechanisms, the company responded quickly and fired the harasser.

As a matter of law, therefore, PetSmart is entitled to summary judgment on Harris's claim for hostile environment harassment.

---

[3] The Court concludes that the affirmative defense is applicable here because, although Harris did later experience a tangible employment action – termination – it is undisputed that Dixon played no role in that decision and, indeed, had been removed from the workplace months earlier. *See Theus v. GlaxoSmithKline*, 452 F. App'x 596, 601 n.7 (6th Cir. 2011) (approving premise that the harassing supervisor "must be involved in the adverse action for the affirmative defense to be unavailable").

11

### B. Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in Title-VII-protected activity; (2) defendant knew of his protected activity; (3) defendant subsequently took an adverse employment action against plaintiff; and (4) the adverse action was causally connected to the protected activity.
*Newton*, 2012 WL 3631493, at *8 (citation omitted). "Retaliation may be proved through direct or circumstantial evidence." *Id.*

Once the plaintiff establishes a prima facie case, the employer may come forward with a legitimate, nonretaliatory reason for the adverse action, which then requires the plaintiff to prove by a preponderance of the evidence that the employer's reason is a mere pretext for retaliation. *Id.*

Harris's retaliation claim fails for two reasons. First, he cannot establish a causal connection between his protected activity and his termination.[4] The only evidence of causation is that he was fired approximately five months after he complained about Dixon's harassment. However, the Sixth Circuit has been clear that "temporal proximity alone may not support an

---

[4] Although Harris complained in his deposition of several negative actions that Bogenschutz took after Harris complained of harassment, he has limited the alleged retaliatory adverse action to his termination. (Doc. 22 at 12) ("Mr. Harris' contention is that his termination roughly five months after his report of Mike's conduct is the only adverse employment action at issue.").

12

inference of retaliatory discrimination absent other compelling evidence." *Id.* (citations omitted). *See also id.* (holding that temporal proximity of three months between protected activity and adverse action was insufficient as a matter of law to establish causation); *Kean*, 466 F. App'x at 471 (two and a half months insufficient).

Harris has conceded that he has no other evidence that PetSmart terminated him because he complained about sexual harassment. (Harris Depo. 277). As a matter of law, therefore, he cannot establish a prima facie case of retaliation.

Second, PetSmart has offered a legitimate reason for discharging Harris: his failure to list his criminal hunting convictions on his application. *See* Harris Depo. at 272 ("They said I was fired for lying on my application.").

"Misrepresentations on an application or resume may constitute a legitimate ground for dismissal." *Algie v. Northern Ky. Univ.*, 456 F. App'x 514, 517 (6th Cir. 2012) (citing *Moos v. Square D Co.*, 72 F.3d 39, 43 (6th Cir. 1995)).

Harris does not assert either that this reason has no basis in fact – *i.e.,* that he did disclose the violations on the application -- or that it is insufficient to justify discharge. *See Algie*, 456 F. App'x 517 (citation omitted). Rather, Harris's only argument as to pretext is that he asked during the application process whether he should list the hunting

13

violations and was told not to do by Dixon and the then-Store Manager.  (Doc. 22 at 14-15).

This argument fails to raise a triable issue of pretext. The fact and nature of Harris's hunting violations were discovered by District Manager Dan Ott after he received a customer complaint about Harris in October 2009.  Ott then determined that Harris had not listed these violations in response to the second question about criminal history on the application, which rendered his certification false.  Harris does not dispute this evidence.  *See Algie*, 456 F. App'x at 517 (holding that plaintiff could not establish discharge for resume fraud to be pretextual).

There is no evidence that Ott was aware that Harris had been instructed not to list the hunting violations, and Ott's belief that Harris had falsified the application – even if incorrect – thus falls within the "honest belief" line of cases which reject a finding of pretext on such evidence.  *See Tingle v. Hillard*, No. 11-3494, 2012 WL 3711439, at *6 (6th Cir. Aug. 29, 2012) (discussing case law).  That is, "a case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination.  Instead, the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action."  *Id.* (citation omitted).

In sum, Harris has come forward with no evidence that PetSmart's discovery of the omissions on his employment application -- triggered by an independent complaint from a PetSmart customer -- and the company's decision to terminate his employment on that basis were in any way related to his prior complaint of harassment.  Harris's retaliation claim thus fails as a matter of law.

Therefore, having heard the parties, and the Court being sufficiently advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 17) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 23rd day of October, 2012.



Signed By:
William O. Bertelsman  WOB
United States District Judge

TIC: 26 min.

15